## Case No. 11,861.

### RISON v. KNAPP.

[1 Dill. 187;[1] 4 N. B. R. 349 (Quarto. 114).]

District Court. E. D. Arkansas. 1868.[2]

BANKRUPTCY—FRAUDULENT PREFERENCE—KNOWLEDGE—INSOLVENCY—PRESUMPTIONS.

1. Where the bankrupts had knowledge of facts sufficient to bring home to the minds of reasonable men knowledge of their insolvency, they must be held to have had that knowledge, and a mortgage to a creditor with knowledge of these facts of their stock of goods is in fraud of the bankrupt act, and the assignee in bankruptcy can maintain an action of trover to recover the value of the property.

[Cited in brief in Cook v. Whipple, 55 N. Y. 156; Work v. Jacobs (Neb.) 53 N. W. 995.]

2. The word "insolvency," as used in the existing bankrupt act [of 1867 (14 Stat. 517)], must be construed to mean, not an absolute inability to pay debts at some future time, upon the settlement and winding up of the party's affairs, but a present inability to pay, as debts mature in the ordinary course of business, although this inability be not so great as to compel an absolute suspension. Arguendo, per Caldwell, J.

3. A debtor does not cease to be insolvent because, being unable to pay his debts as they mature, his creditors have agreed to extend the time of payment (see Kinsing's Assignee v. Bartholew [Case No. 7,831]); and the payment of a pre-existing debt by an insolvent is on his part illegal under the bankrupt act, though made in the expectation by him that he will eventually be able to pay all. Arguendo, per Caldwell, J.

4. The conveyance of the whole of the property of a party to one creditor to secure a pre-existing debt is fraudulent and void, and the party must be presumed to have known the natural consequences of his own act; and the intent to prefer may be inferred from the fact of preference.

[Cited in Martin v. Toof, Case No. 9,167; Re Heller, Id. 6,337.]

[See In re Batchelder, Case No. 1,098.]

5. A conveyance not made in the usual and ordinary course of business of a debtor is prima facie fraudulent and void. The phrase "usual and ordinary course of business," construed.

[See Babbitt v. Walbrun, Case No. 694.]

6. The doctrine of pressure by a creditor to force the giving of security for the payment of a debt is not applicable under the present bankrupt act, and it is no answer when a debtor mortgages his property to secure such a debt to say that he was "pressed to do it."

7. When a party knows at the time of purchasing goods that the bankrupts had failed in business, and that his vendors held the goods under mortgage from the bankrupts, these facts are sufficient to put him on his guard, and he is

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed by circuit court. Case unreported.]

bound to inquire into the transactions between the bankrupts and his own vendors.

8. To constitute a bona fide purchaser for value, he must not only show that he had no notice, but he must have paid a consideration at the time of the transfer, either in money or in other property, or by a surrender of existing debts or securities.

[Cited in People's Sav. Bank v. Bates, 120 U. S. 567, 7 Sup. Ct. 683.]

At law.

U. M. Rose and T. D. W. Yonley, for plaintiff.

Clark, Williams & Martin, for defendants.

CALDWELL, District Judge. This is an action of trover, brought by the plaintiff, as assignee in bankruptcy of Heddens & McDiarmid, against the defendant Knapp, for goods of the bankrupts converted before they were adjudicated bankrupts. The defendant filed his plea of "not guilty," and the parties by agreement have submitted the questions of fact as well as of law to the court.

The material facts in the case are these: Heddens & McDiarmid, the bankrupts, purchased an old stock of general merchandise, and commenced business as retail merchants in the city of Little Rock, in September, 1866. In February, 1867, they were indebted to W. W. Walton, or his assignees, on account of the purchase of their original stock, in the sum of $4,000, and one of their partners, Heddens, was indebted to the same party on the same account in the sum of $500. They were also indebted to Chambers, Sterns & Co., of Cincinnati, Ohio, for goods purchased, in the sum of $2,267.97, and to Prichard, Alter & Co., of Cincinnati, for goods purchased in the sum of $595.55.

In February, 1867, the firm notes for all of this indebtedness (except the $500) were outstanding and overdue, and suit had been brought in the circuit court of the United States for this district against the firm, on the notes payable to Chambers, Sterns & Co., and to Prichard, Alter & Co., and against Heddens on the $500 note; and about this time the creditors of Walton sued out writs of garnishment against them, on account of their indebtedness to Walton. They were also indebted at this time to Campbell & Strong, cotton factors at New Orleans, in about the sum of $5,000 for money advanced on cotton, and to Barnes & Bro., of Little Rock, in the sum of $2,000 on cash account.

Finding themselves in embarrassed circumstances and unable to meet their commercial paper, one of the bankrupts, McDiarmid, testifies that he went to New Orleans about the first of March to see Campbell & Strong, and, if possible, obtain from them some further advances, to enable them to pay off their Cincinnati indebtedness, on which suit had been brought, and which would probably go into judgment early in April.

The witness says he represented to Camp-

bell & Strong that they (the bankrupts) had in their store at Little Rock. a stock of goods worth about $10,000 or $12,000; that they owed to Cincinnati houses about $3,000, that suits had been brought on these claims, and judgments would probably be obtained about the 8th of April.

The witness says he told Campbell & Strong about the $4,000 indebtedness to Walton, but stated to them that they (the bankrupts) had a set-off against this indebtedness. What this set-off was does not appear, and it does not appear that the bankrupts had any valid defense to any part of this indebtedness. Nothing was said to Campbell & Strong about the $2,000 indebtedness of the bankrupts to Barnes & Bro., or the $500 indebtedness of one of the partners, Heddens, to Walton.

After making this statement of their affairs, the witness says he proposed to Campbell & Strong that if they would make a further advance of $3.000, to enable his firm to discharge the Cincinnati debts, they would mortgage or convey to Campbell & Strong their stock of goods to secure the $5,-000 then due, as well as the amount of the new advance.

Campbell & Strong referred the matter to their attorneys at Little Rock, writing them as follows:

"New Orleans, 12th March, 1867.
"(Per McDiarmid.)

"Samuel W. Williams, Esq., or Clarke, Williams & Martin, Little Rock, Ark. Gentlemen: Mr. McDiarmid, of the house of Heddens & McDiarmid, of your city, is now here, and we have settled with them, and find due us cash advanced on cotton $6,-571.58, for which we have taken their notes at thirty and sixty days (half each) against which they now have in our hands nineteen bales of cotton, which, when sold, will apply on first note, say, probably, $2,100, leaving due us about $4,471.58, for security of which they have agreed to make over to us their entire stock of goods in their store at Little Rock, which they say will amount to $15,-000. H. & McD. are owing a debt of $2,700 to two houses in Cincinnati, who have sent on their claims to force collection, and will, as they say, go into judgment against them at your next term of court, 8th April next, and which they (H. & McD.) say they can put off payment of until December next, by giving our acceptance.

"They represent to us that all they owe is this debt of $2,700. Now we wish you to take an assignment of their entire stock of goods to us, to first secure the $4,400 or $4,-500 now due us, and allow them to go on with this business as before (if such a thing can be done safely) and if you can get abundance of security. over and above the amount now due us, we will accept for them for the amount of $2,700 at nine months.

"On receipt of this you will please call on them and learn all the particulars of their business, their standing, &c., and take the security as before stated, or in any way they can secure us to your satisfaction. They desire to first secure us before these claims from Cincinnati are put into judgment against them, or if we can be made perfectly safe, we are willing to go on their paper for $2,700 at nine months, in which case they will continue their shipments of cotton to us as before and not draw for more than half the value of shipments till they get the $4,400 debt paid, and the acceptance of $2,700 they can meet in the fall by shipments of cotton or cash payments. through the summer.

"They are wanting about $300 worth of dry goods now, which we will purchase and ship them per first boat; besides, Mr. McDiarmid wants $75 to go home with, which we will let him have, and which will increase their account to $400. We suppose they now have a shipment of cotton on the way, as we are just presented with another of their drafts at five days for $600. Our young man, Mr. James H. Pashal, is in your part of the country, and will call and see you. You can show him this letter, and confer and advise with him and with us at your earliest possible convenience. To sum up, if an assignment, transfer, or sale of their stock of goods to us can be legally made, so as to secure first their present indebtedness, and meet the further acceptance of $2,700 to be granted them, please take the same in a proper shape. Your immediate attention to this, and your early reply are particularly requested.

"Very respectfully yours, Campbell & Strong."

The bankrupts made substantially the same statement to the attorneys of Campbell & Strong in this city, in relation to their affairs. that had been made by McDiarmid to Campbell & Strong in New Orleans. The evidence does not show whether the attorneys of Campbell & Strong made any effort to verify the correctness of the bankrupts' statements as to the value of their stock of goods, or the amount of their indebtedness; but on the 21st March the bankrupt executed and delivered to the attorneys of Campbell & Strong a bill of sale of their entire stock of goods. The preamble to the bill is as follows: "Whereas, we, Heddens & McDiarmid, are indebted to Campbell & Strong, of New Orleans, La., in about the sum of $4,000; and whereas, we desire further advances to the amount of say $3,000 which the said Campbell & Strong agree to advance by accepting our drafts due first day of January next, provided the property hereinafter conveyed shall be sufficient to secure the same, together with our present indebtedness, as aforesaid."

Following this preamble is a conveyance of the stock of goods for the purpose of securing and paying said indebtedness and any advances that may be made.

The trustee mentioned in the conveyance, George Kingsbury, had been the clerk of Heddens & McDiarmid ever since they had been in business. After this conveyance, Heddens & McDiarmid continued in the store, as before, and in the language of the witness, Kingsbury, "drew their living from it, and paid their small debts about town out of it." Immediately, or very soon after this conveyance was executed, an invoice of the goods was taken, when it appeared that there was not more than $6,000 or $7,000 worth of goods in the store, valuing them at cost price, and that many of the goods were old, and had been purchased in 1865 and 1866, when goods were very high, and their actual cash value at the time the invoice was taken was not more than $3,000 or $4,000.

The trustee, Kingsbury, knew the character and value of the goods before and at the time of the conveyance, and could and would have imparted the facts to Campbell & Strong, or their attorneys, if he had been applied to for that purpose.

Campbell & Strong never made any advances to Heddens & McDiarmid after the goods were conveyed to them. On the 9th day of April, Heddens & McDiarmid mortgaged the same stock of goods (subject to the previous conveyance to Campbell & Strong) to Barnes & Bro. to secure an indebtedness of $2,200. Barnes & Bro. had full notice of the condition of the bankrupt's affairs at the time they took their mortgage. Neither Heddens nor McDiarmid had any individual property, and the stock of goods comprised all the partnership assets except their book of accounts, amounting nominally to about $2,000, but of which only $300 or $400 were collectible or of any value.

McDiarmid, one of the bankrupts, swears that he did not consider the firm broken up or insolvent at the date of the transactions, and that they expected to be able to continue in business if they could get Campbell & Strong to advance them $3,000 to pay off their Cincinnati debts, then overdue and in suit. On the 29th day of May, Campbell & Strong and Barnes & Bro., claiming the property under the mortgages made to them respectively by Heddens & McDiarmid, sold the goods in question to the defendant Knapp. Knapp was to pay $3,500 for the goods, for which sum he executed his notes, payable in six and nine months from date. He paid nothing down, and has paid nothing on the notes, and don't expect to pay if this suit goes against him.

The parties from whom Knapp purchased the goods still hold his notes, and they are overdue. Knapp knew of the failure of Heddens & McDiarmid at the time he purchased, and the marshal levied on the goods as the property of Heddens & McDiarmid about thirty minutes after he acquired the possession under his purchase.

On the 15th day of August, 1867, Heddens & McDiarmid were adjudicated bankrupts on the petition of their Cincinnati creditors, and the plaintiff in this case was afterwards duly appointed their assignee. The proof establishes, beyond doubt, the utter insolvency of Heddens & McDiarmid at the date of these transactions. They had no individual property, and the goods in the store and their book accounts composed their entire partnership assets.

The goods were not worth, at the date of their sale to Campbell & Strong, over $5,000. The weight of evidence shows that this sum could not have been realized from their sale, in the ordinary course of business, and the store accounts did not exceed $400 in value. At the same time, their debts amounted, in the aggregate, to $14,000.

But it is said the bankrupts were ignorant of the actual condition of their affairs, and honestly believed they would be able to continue their business and pay their debts, and that this sale to Campbell & Strong was made to enable them to do this, that the term "insolvent," as used in the bankrupt act, means one whose business is actually broken up for want of means to carry it on, and not a mere present inability to pay debts in the ordinary course of business—that a merchant may not be able to pay his debts, as they mature, and still not be insolvent, and that a merchant so circumstanced, and entertaining an honest belief of his ability to ultimately pay his debts, may lawfully do what the bankrupts did in this case.

The bankrupts had full knowledge of the condition of their affairs; they knew the amount of their indebtedness, and they knew they had no assets except their stock of goods. They knew the character, cost, and value of these goods, for most of them had been on their shelves more than a year, and they must have known, what is so clearly established by the testimony, that the receipts from the sale of this stock of goods, in the ordinary course of business, would not more than pay the rent of the storehouse, and defray the current expenses, which were drawn, and expected to be drawn, from the store, and that they would cease to do this in a short time.

Grant that the bankrupts believed they would be able to support their families, pay all the current expenses of their business, and discharge some $14,000 of indebtedness with an old stock of goods, the actual value of which was less than one-half of the amount of their indebtedness,—can a belief, so chimerical, however honestly entertained, alter the facts?

Whatever their belief was, the fact of hopeless insolvency remained, and having knowledge of facts sufficient to bring home to the minds of reasonable men knowledge of their insolvency, they must be held to have had that knowledge. Merchants' Nat. Bank of Hastings v. Truax [Case No. 9,451].

The words "insolvent, or in contemplation of insolvency or bankruptcy," in this act, are

not to receive the interpretation put upon the words "in contemplation of bankruptcy," occurring in the second section of the bankrupt act of 1841 [5 Stat. 442].

Different interpretations were placed upon the words "in contemplation of bankruptcy," in the act of 1841, in different circuits. In some circuits they were held to mean contemplation of insolvency, and inability to pay as debts should become payable, whereby the debtor's business would be broken up. In another circuit, it was held the debtor must contemplate an act of bankruptcy, or a decree adjudging him a bankrupt on his own petition. The latter interpretation was finally given to them by the supreme court. Buckingham v. McLean, 13 How. [54 U. S.] 150. In this case, the supreme court defines "contemplation of insolvency" to mean "inability to pay as debts become payable, whereby the business would be broken up." And it is here settled that "contemplation of bankruptcy" meant something more than insolvency. Carr v. Hilton [Case No. 2,436].

The thirty-fifth section of the act of March 2, 1867, is almost identical with sections 90 and 91 of the insolvent acts of Massachusetts. See appendix to Hil. Bankr. 466.

The words in question, "insolvent, or in contemplation of insolvency," are used in the thirty-fifth section of the bankrupt act, in precisely the same connection that they occur in the Massachusetts insolvent law; and congress, having adopted the very words of that law, and those words having received an interpretation by the supreme court of that state, which was well known and understood at the time the bankrupt act was passed, it must be held (in the absence of something showing a contrary intention), that they were intended to have the same meaning, and receive the same construction given to them in that state.

And the supreme court of Massachusetts has held that the term "insolvency," as used in the insolvent act of that state, when applied to traders, does not mean an absolute inability of the debtor to pay his debts at some future time, upon a settlement and winding up of his affairs, but a present inability to pay in the ordinary course of his business, and that a trader is insolvent when he cannot pay his debts in the ordinary course of business as men in trade usually do, although his inability be not so great as to compel him to stop business, and although he may be able to pay his debts at a future time, upon the winding up of his concerns. Thompson v. Thompson, 4 Cush. 127; Lee v. Kilburn, 3 Gray, 594; Kent, Comm. (10th Ed.) 509, note a; Vennard v. McConnell, 11 Allen, 555.

In the last case cited, Chief Justice Bigelow, speaking for the supreme court of Massachusetts, says: "Nor can it be doubted that the appellant was insolvent, in the legal sense of that word, if he was unable to pay his debts as they fell due, according to the usage of the trade in which he was engaged, and of the place in which he carried on his business, in ordinary times and under ordinary circumstances, notwithstanding many others employed in similar occupations may also have been in a like condition of insolvency. The proposition cannot be maintained consistently with the established rules of law, that a debtor ceases to be insolvent because, being unable to pay his debts in the regular course of business, his creditors have entered into an agreement to extend the time of payment of their debts; or that the payment of a debt by a party who is insolvent cannot be regarded as a preference if made with the hope and expectation by the debtor that he will be able eventually to pay all his debts in full. The adjudicated cases leave no room for doubt on these points." Thompson v. Thompson, 4 Cush. 127; Lee v. Kilburn, 3 Gray, 594; Holbrook v. Jackson, 7 Cush. 136, 149; Barnard v. Crosby, 6 Allen, 327. And the same interpretation has been put upon these words in the present bankrupt act, by Judge Nelson, in Merchants' Nat. Bank v. Truax [supra], and in Re Black [Case No. 1,457].

Heddens & McDiarmid came within the definition here given of an insolvent at the date of this transaction. They were not only not able to pay their debts in the ordinary course of business, but they owed debts two or three times greater in amount than the value of all the property they possessed.

The bankrupts were not able to pay their debts in the ordinary course of business as merchants in trade usually do. Suits had been brought on their mercantile paper long overdue, and they had no means to pay their debts, or avert the consequences of a judgment, which would have resulted in an immediate stoppage of their business, by a levy on their stock of goods, except by borrowing, a process which, while it might have furnished a momentary relief, would not have extricated them from their financial embarrassments and ultimate inevitable bankruptcy.

Campbell & Strong knew these facts—indeed it was the knowledge of these facts that prompted them to seek the security their attorneys obtained for them. To know these facts was to know the bankrupts were insolvent, and to confess these facts, and, at the same time, deny knowledge of the bankrupts' insolvency, is simply a denial of the law applicable to the case.

There is another view to be taken of this case, which is equally conclusive against the pretensions of Campbell & Strong.

The rule is well established that a conveyance of the whole of a trader's property, or of the whole, with a colorable exception made to a creditor, as a security for a preexisting debt, is fraudulent and void, not only because he thereby deprives himself of the power of carrying on his trade, and withdraws his effects from the reach of his other creditors, but because such a conveyance must either be fraudulently kept secret, or produce

;an immediate absolute bankruptcy. Deac. Bankr. 68; Shelf. Bankr. 140, and the English cases there cited; Ex parte Brennan [Case No. 1,830]; Perry v. Langley [Id. 11,-006]; Morse v. Godfrey [Id. 9,856]; Everett v. Stone [Id. 4,577]; Peckham v. Burrows [Id. 10,897].

Here the bankrupts, Heddens & McDiarmid, did convey to one of their creditors the whole of their property to secure a pre-existing debt. They must be presumed to have known the natural consequences of their own acts, and so with Campbell & Strong. They knew of the embarrassments of Heddens & McDiarmid, and they or their agents might have known of their utter insolvency if they had put themselves on inquiry as they should have done. They could not but have known that this mortgage did give them a preference, which was a fraud upon the bankrupt act. That was the necessary and inevitable consequence of the act, and they must in law be taken to have intended it. The intent to prefer may be inferred from the fact of preference. Beals v. Clark, 13 Gray, 18.

But this fact is not left to an inference of law. In their letter to their attorneys, Campbell & Strong say: "They (Heddens & McDiarmid) desire to first secure us before this claim from Cincinnati is put in judgment against them."

Here is the deliberate declaration of Campbell & Strong themselves, that the purpose of this mortgage was to secure them in preference to the Cincinnati creditors. But it is said the mortgage was made to secure future advances, as well as a pre-existing debt.

In answer to this suggestion it is enough to say that the primary object of the mortgage was to secure an old debt; that there was no absolute agreement for advances at all events, but only in the event that the mortgaged property would yield sufficient to pay such advances, after first paying the old indebtedness; that no advances were, in fact, made and that if the full sum mentioned had been advanced, it would not have enabled the bankrupts to discharge their debts or continue their business, but would still have left some six thousand dollars of debts wholly unprovided for.

This is a much stronger case than that of Peckham v. Burrows [supra], where Justice Story uses this language: "So that, stripped of its artificial form, we have an indebtedness, to the full extent of all their means, to say the least of it, with a possibility of escaping from immediate insolvency and stoppage of their business, only by future credits, to be given to them by the defendant at his pleasure, and those credits avowedly to be given upon the basis of a direct preference over all the other creditors in case of that very insolvency and stoppage of business. It is difficult for me to perceive a clearer case for the application of the act of congress to conveyances made in contemplation of bankruptcy." &c.

And the supreme court of Massachusetts, says: "It does not rebut the intent to prefer, to show that the debtor has also another motive to the proceeding, namely, an expectation of future benefit to himself, by means of future loans of money, and being enabled thereby to continue his business." Denny v. Dana, 2 Cush. 172.

Finally, this conveyance is prima facie fraudulent and void, because it was not made in the usual and ordinary course of business of the debtors. In determining whether a given transaction is made in the ordinary and usual course of business of a party, "the question is not whether such transactions are usual in the general conduct of business throughout the community, but whether they are according to the usual course of business of the particular person whose conveyance is the subject of investigation. And if it is a departure from his usual and ordinary course of business, the statute intends that the party taking the conveyance from him shall be put upon inquiry." Nary v. Meerill, 8 Allen, 451; Tuttle v. Truax [Case No. 14,277].

Independent of this express provision of the bankrupt act, the general rule of law in this class of cases is, that the transfer or delivery of property will be considered fraudulent when it is not delivered in the usual course of trade, or of the accustomed dealings between the parties. 1 Deac. Bankr. 609, and cases there cited.

There is no proof tending in the slightest degree to rebut this prima facie case in favor of the plaintiffs. An invoice of the goods or a single inquiry of Kingsbury, the clerk, would have disclosed all the facts in reference to the bankrupts' property, as they have been disclosed in the evidence on the trial of this cause; and Campbell & Strong cannot escape responsibility by pleading ignorance of facts, the knowledge of which they might have easily acquired by putting themselves upon such inquiry as the law requires of parties in such cases. Peckham v. Burrows, supra.

But it is said this conveyance by the bankrupts was the result of the pressure of Campbell & Strong, and cannot, therefore, be said to have been a voluntary preference on the part of the bankrupts, and that none but voluntary preferences on the part of a bankrupt are fraudulent under the bankrupt act.

This doctrine of pressure has no application under the present bankrupt act. If the trader is insolvent and he knows the fact, and one of his creditors knowing that fact "presses" him for payment, and such payment is made, the transaction is clearly a fraud upon the bankrupt act and the other creditors of the debtor.

The trader knowing himself insolvent and unable to pay all his debts, must know that mortgaging his whole property to one creditor, or paying one creditor in full, will operate to give that creditor a preference over his other creditors, and the law holds every

one to intend the necessary result of his act. And it is no answer to such action on the part of a trader to say his creditors "pressed" him, and threatened to sue or attach. [The duty of the trader in such case is very plain under our present bankrupt act. He should file his petition in bankruptcy, to the end that his assets might be distributed equally among all his creditors.][3]

Again, it is a fundamental principle of law that no man shall take advantage of his own wrong. A creditor who, knowing his debtor to be insolvent and unable to pay all his debts, resorts to pressure to compel such insolvent debtor to secure or pay his debt in full, perpetrates a deliberate fraud upon the bankrupt act and the other creditors of the debtor, because it is one of the chief objects of that act to secure an equal distribution of insolvents' estates among all their creditors, and to utterly extirpate the right of preference that existed at common law.

The law would fail of its chief object and purpose if this doctrine of pressure is to be recognized. If the doctrine could be supported under the present act, it would not avail Campbell & Strong in this case, because it certainly could not be held to extend to giving the bankrupt an election to prefer one of half a dozen creditors, all of whom were pressing them with equal vigor. Here the Cincinnati creditors had pressed for payment and been refused, and had resorted to the law to coerce payment of their debts. The assignees of Walton had done the same, and this pressure was prior to that of Campbell & Strong, and was subsisting at the time they obtained their mortgage.

Is the defendant Knapp, who purchased the goods in question from Campbell & Strong, a bona fide purchaser, for a valuable consideration, without notice?

Knapp knew at the time he purchased that the bankrupts had failed in business and stopped payment, and that the title of Campbell & Strong and Barnes & Bro. to the goods in question was derived from the mortgages executed to them by the bankrupts, and that the bankrupts had no other property, and that these goods were not sufficient to pay their debts. These facts were sufficient to put Knapp upon inquiry, and he was bound to inquire into, and ascertain the true nature of the transaction between the bankrupts and Campbell & Strong. The slightest inquiry would have disclosed facts showing that Campbell & Strong's title was defective.

Knowing facts sufficient to put a man of ordinary care and prudence upon inquiry, and having failed to make inquiry or take any steps to acquire information of the facts for his protection, he is now estopped from claiming that he is a bona fide purchaser without notice.

He is not a purchaser for value in the sense of the rule upon this subject. He paid no money for the goods; he executed his notes for the whole amount; has paid no part of the notes. The notes are still in the hands of the payees, Campbell & Strong and Barnes & Bro., and are all overdue, and have lost the incidents of negotiability.

Protection is not given by the rules of law to a party in such a predicament. He must not only have had no notice, but he must have paid a consideration at the time of the transfer, either in money or other property, or by a surrender of existing debts or securities. Morse v. Godfrey [supra]; Will. Eq. Jur. 256; 2 Lead. Cas. Eq. 116.

All that has been said with reference to the invalidity of the transfer to Campbell & Strong, applies with double force to the mortgage made to Barnes & Bro.

Their mortgage was subsequent to Campbell & Strong's, and they took it with full knowledge of the insolvency of Heddens & McDiarmid, and with a view to obtain a preference. I think the goods were worth what the defendant agreed to pay Campbell & Strong and Barnes & Bro. for them.

Let judgment be entered for $3,400, and eight months' interest thereon. Judgment accordingly.[3]

NOTE. Since this opinion was delivered, this question of the effect of pressure on the part of creditors has been passed upon by other judges, and the ruling has been uniform that it constitutes no defence. Foster v. Hackley [Case No. 4,971]; Wilson v. Brinkman [Id. 17,794]; Graham v. Stark [Id. 5,676]; Giddings v. Dodd [Id. 5,405]. As to fraudulent preferences, see Andrews v. Graves [Id. 376]; Giddings v. Dodd [supra]; Linkman v. Wilcox [Case No. 8,374]; Darby's Trustees v. Boatman's Sav. Inst. [Id. 3,571]; Vanderhoof v. City Bank of St. Paul [Id. 16,842]; Martin v. Toof [Id. 9,167].

---

RIST (CLARKE v.). See Case No. 2,861.

---

[3] [From 4 N. B. R. 349 (Quarto, 114).]

[3] This judgment was pronounced in 1868, and on a writ of error, affirmed by Mr. Justice Miller, at the April term, 1870. [Case unreported.]

