In re NATHAN.

(District Court, D. Nevada.  March 13, 1899.)

No. 3.

1. BANKRUPTCY—PREFERENCES—INJUNCTION PENDING PROCEEDINGS.

Where a petition in involuntary bankruptcy has been filed against a debtor, alleging, as an act of bankruptcy, the giving of a chattel mortgage on his stock in trade with intent to prefer the mortgage creditor, and the latter has taken possession of the goods with knowledge that the debtor was insolvent and that proceedings in bankruptcy had been, or would soon be, instituted by other creditors, he may be enjoined from selling or otherwise disposing of the property pending the adjudication in bankruptcy; and it is immaterial that the mortgage was given to secure a debt contracted in good faith before the passage of the bankruptcy act.

SAME.

Pending a petition in involuntary bankruptcy, the petitioning creditors prayed for an injunction against the holder of a chattel mortgage on the bankrupt's stock in trade, alleged to have been given as a fraudulent preference, forbidding him to make sale or other disposition of the goods which he had taken into possession under the mortgage. He answered that he had sold such goods before actual notice of the proceedings in bankruptcy, but there was evidence that the sale was simulated, and a mere device to place the property beyond the reach of other creditors, and that he still had control over the property or a portion of it. Held, that the injunction should issue as prayed.

In Bankruptcy.  Rule to show cause why an injunction should not issue against L. J. Cohn.

On February 22, 1899, Hoffman, Rothchild & Co., Greenebaum, Weil & Michels, and Brown Bros. & Co., creditors of M. Nathan, petitioned this court to have Nathan adjudged a bankrupt under the bankrupt law of 1898.  On February 27, 1899, they filed a petition, in said proceedings, against L. J. Cohn, in which, among other things, it was alleged that:  "On or about the 21st day of February, 1899, your petitioners, being then and there qualified creditors of said M. Nathan, filed herein a petition praying that said M. Nathan be adjudged a bankrupt, within the true intent and meaning of the acts of congress relating to bankruptcy, upon the ground that the said M. Nathan transferred, while insolvent, all of his property to two of his creditors, with intent to prefer such creditors over the other creditors of said M. Nathan.  *  *  *  That said M. Nathan is insolvent, and that, within four months next preceding the date of said petition, the said M. Nathan committed an act of bankruptcy, in that he did heretofore, to wit, on the 14th day of February, A. D. 1899, and on the 15th day of February, A. D. 1899, at the city of Reno, county of Washoe, state of Nevada, and within said district,

being insolvent, transfer all of his property to L. J. Cohn and Washoe County Bank, then and there creditors of said M. Nathan, with intent to prefer such creditors over the other creditors of said M. Nathan. * * * That said transfer to said L. J. Cohn * * * was made with a view to prevent said M. Nathan's property from coming to his trustee in bankruptcy, and to prevent said property from being distributed ratably among his creditors, and to defeat the object of, and to hinder, impede, and delay the operation of, and to evade the provisions of, the acts of congress relating to bankruptcy. That said transfer to said L. J. Cohn was a chattel mortgage, wherein and whereby it was intended by said M. Nathan to secure said L. J. Cohn for a debt in said chattel mortgage alleged to be the sum of $4,807; " and prayed for an order of this court enjoining and restraining said L. J. Cohn from disposing of or selling any of the said personal property until the further order of this court. Upon the presentation of this petition, the court made an order upon said L. J. Cohn to appear and show cause, on March 6, 1899, if any he could, why the prayer of said petition should not be granted, and in the meantime issued a restraining order. On March 6th, in pursuance of said order, the said L. J. Cohn appeared and filed an answer to the petition denying that the transfer from Nathan to himself "was made with a view to prevent said Nathan's property from coming or going to his trustee in bankruptcy, or to prevent said property from being distributed ratably," or "that the said chattel mortgage was given by said M. Nathan or received by the said L. J. Cohn through collusion or conspiracy between said M. Nathan and said L. J. Cohn, or with the intent or purpose to deprive the petitioning creditors, or other creditors, of said M. Nathan of their just or any rights in the premises, under the provisions of the acts of congress relating to bankruptcy." And further alleged: "That on the 31st day of October, 1896, the said L. J. Cohn and the said M. Nathan had a settlement of their accounts, and there was found due and owing, from the said Nathan to the said Cohn the sum of three thousand six hundred and fifty dollars, and on the last-mentioned date the said M. Nathan made, executed, and delivered to the said L. J. Cohn his promissory note, in writing, for the said sum of three thousand six hundred and fifty dollars, with interest thereon at the rate of eight per cent. per annum from date thereof until paid. That no part of the said principal sum, nor the interest thereon, had been paid up to the 14th day of February, A. D. 1899. That on the 14th day of February, A. D. 1899, the said M. Nathan and the said L. J. Cohn had a settlement of all of their said accounts, and including the said note of three thousand six hundred and fifty dollars, and the interest thereon, and the balance due from the said Nathan to the said Cohn for services as a clerk in his said store, there was found due and owing from said Nathan to the said Cohn the sum of four thousand eight hundred and seven dollars. That on the said 14th day of February, 1899, the said M. Nathan made, executed, and delivered to the said L. J. Cohn his promissory note for the sum of four thousand eight hundred and seven dollars, with interest thereon at the rate of eight per cent. per annum from date until paid. That on the said 14th day of February, A. D. 1899, the said M. Nathan, to secure the payment of the said promissory note and the interest thereon, made, executed, and acknowledged and delivered to the said L. J. Cohn a chattel mortgage on the stock of goods and book accounts described in said petition. That on the 15th day of February, A. D. 1899, under and by virtue of the said chattel mortgage, the said L. J. Cohn took possession of the said goods, wares, and merchandise and book accounts, and between the 15th day of February and 23d day of February, A. D. 1899, both days inclusive, and before the restraining order, or any papers issued out of this honorable court, were served upon him, sold and delivered to divers persons the whole of said goods, wares, and merchandise and book accounts described in said petition, and set forth and described in the chattel mortgage from M. Nathan to the said L. J. Cohn." At the hearing the note and mortgage were introduced in evidence. The note was made payable "one day after date." The mortgage contained the clause "that if the mortgagor shall fail to make any payment, as in the said promissory note provided, then the mortgagee may take possession of the said property, using all necessary force so to do, and may immediately proceed to sell the same

at private or public sale, and in the manner provided by law, and from the proceeds pay the whole amount in said note specified." The testimony submitted at the hearing, among other things, shows that Cohn is the brother-in-law of Nathan, and had been a clerk in Nathan's store for several years, and lived at his house. That one day after the execution of the note and mortgage Cohn took possession of all the personal property mentioned therein, and disposed of the entire property, between the 15th and 23d of February. No notice of the sale was given. The greater portion of the goods (all but $96.25) was sold on February 23d, which was one day after the notice of the filing of the creditors' petition to have Nathan adjudged a bankrupt was served upon Nathan, by leaving the same with his wife. Cohn denied having knowledge of the papers that were served upon Nathan, but admitted knowledge of the service of some papers, and that "he surmised what the papers were." The sale of the goods amounted, in the aggregate, to $1,444.25. Other facts are stated in the opinion.

Torreyson & Summerfield, for petitioners.

Benj. Curler, for respondent L. J. Cohn.

HAWLEY, District Judge (orally). It has been held that no transfer of property, lien, or incumbrance, by mortgage or otherwise, is to be avoided by any adjudication in involuntary bankruptcy, unless made or created subsequent to the passage of the bankrupt act. In re Brown, 91 Fed. 358. But it by no means follows that, because a bona fide debt was created before the passage of the act, a mortgage or lien of any kind could be given after the passage of the act to secure such a debt, so as to avoid any proceeding instituted by the petitioning creditors to have an adjudication in bankruptcy against the party giving the mortgage. In re Sievers, 91 Fed. 366, 369. If the mortgage in question was given for the purpose of hindering, delaying, and defrauding other creditors of Nathan, there cannot be any controversy as to the power of the court to enjoin Cohn, pending involuntary proceedings against Nathan, from disposing of any of the property in his possession or under his control. In re Abbott, 1 Hask. 250, Fed. Cas. No. 10; In re Brooks, 91 Fed. 508. That Cohn knew that Nathan was insolvent, and expected that proceedings in bankruptcy had been, or would soon be, instituted by other creditors of Nathan, is clearly shown by his testimony. The mortgage, as between Nathan and Cohn, was valid; but from the evidence introduced upon this hearing it cannot be said that Nathan, executed the mortgage upon all his personal property, and authorized Cohn to sell the same at private sale, for the honest purpose of discharging his indebtedness, and in the confident expectation that by so doing he could continue his business, and it is only upon that theory, if at all, that the transaction could be upheld as against other creditors. Tiffany v. Lucas, 15 Wall. 410. The giving of such a mortgage to secure Cohn, and to give him a preference over other creditors, was of itself an act of bankruptcy. Bankrupt Act 1898, c. 541, subc. 3, § 3, subds. a–c; Id. subc. 7, § 67. The filing of the petition by the creditors was, as is said in Bank v. Sherman, 101 U. S. 403, 406, "a caveat to all the world. It was, in effect, an attachment and injunction. Thereafter all the property rights of the debtor were ipso facto in abeyance until the final adjudication. * * * Those who dealt with his property in the interval between the filing of the petition and the final adjudication did so at their peril." See, also, In re Brooks, supra. The law

as declared in numerous cases, under prior acts of bankruptcy (and equally applicable to the act of 1898), is well settled that a sale or other disposition, out of the usual course of business, of all of one's stock in trade, to a person who knows the seller's insolvency, is prima facie evidence that the sale was fraudulent. Ashby v. Steere, 2 Woodb. & M. 347, Fed. Cas. No. 576; Babbitt v. Walbrun, 1 Dill. 19, Fed. Cas. No. 694; Id. Fed. Cas. No. 695; Lawrence v. Graves, Id. 8,138; Martin v. Toof, Id. 9,167; Toof v. Martin, 13 Wall. 40, 48; Rison v. Knapp, 1 Dill. 187, Fed. Cas. No. 11,861; Wakeman v. Hoyt, Fed. Cas. No. 17,051.

In Ashby v. Steere, supra, the court said that:

"If the debtor elected to pay a relative to whom he was indebted; if the transfer or conveyance was done secretly; if it was out of the usual course of business, in a new, extraordinary, or unusual manner; if it was just in the hurry of going into insolvency, a day or two, or an hour or two, before making the petition; * * * or if the debtor should convey away the whole of his property on the eve of bankruptcy,—any of these circumstances would tend to show his intention to prefer the creditor to whom the payment or transfer was made."

In Toof v. Martin, 13 Wall. 48, the court said:

"The transfer, in any case, by a debtor, of a large portion of his property, while he is insolvent, to one creditor, without making provision for an equal distribution of its proceeds to all his creditors, necessarily operates as a preference to him, and must be taken as conclusive evidence that a preference was intended, unless the debtor can show that he was at the time ignorant of his insolvency, and that his affairs were such that he could reasonably expect to pay all his debts. The burden of proof is upon him in such case, and not upon the assignee or contestant in bankruptcy."

In Wakeman v. Hoyt, Thompson, Circuit Justice, said:

"Why is giving a preference to be considered a fraud on this act? Because the act contemplates an equal distribution. It is a fraud because it counteracts the policy of the law. Though it may not be fraudulent in a moral point of view, it must be fraudulent if it contravenes the policy of the law. So, when the trader procures the levy of an execution on his property, it is favoring one creditor over the other. This would not be a fraud, if it were not for the bankrupt law. It is precisely as honest an act for the debtor to procure an attachment or execution, to be levied on his property by a creditor, as it is to secure to him a preference by means of the conveyance. It is fraudulent only because it counteracts the policy of the law, and this is equally true in the one case as in the other. I am, therefore, in this view of the case, of opinion that a conveyance or assignment by a trader of all his property, to secure a preference to particular creditors, is, per se, a fraud upon the act of congress and an act of bankruptcy."

In the disposition of property among creditors equality is equity. It is the genius and purpose of the act of 1898 to secure this result as far as possible from the moment its aid is invoked, whether by the debtor or by his creditors. Its exercise is vital to the ends of justice, and is necessary in order to enable the courts to enforce and make effective the various provisions of the act. The policy of the bankrupt act is to secure an equal distribution of the assets of the bankrupt among all his creditors, and a court of bankruptcy in which the bankrupt proceedings are pending, in order to preserve the property and protect the rights of all the creditors, has the unquestioned jurisdiction and power to enjoin any disposition thereof which would be in violation of the spirit, intent, and purpose of the act. In re Calen-

dar, Fed. Cas. No. 2,308; In re Camp, Id. 2,346; In re Holland, Id. 6,605; In re Smith, Id. 12,993, 12,994; Bush, Bankr. 411; Blake, Moffit & Towne v. Francis-Valentine Co., 89 Fed. 691, 693, 694, and authorities there cited.

If there had been no sale, or pretended sale, of the goods by Cohn, it is clear that the mere execution and delivery of the mortgage by Nathan, and possession of the property by Cohn, would justify the court, bankruptcy proceedings having been commenced by other creditors against Nathan, in issuing the injunction as prayed for by the petitioning creditors.

But it is seriously argued that no injunction should issue against Cohn, as he had sold all the property included in the mortgage prior to actual notice of the filing of the petition by the creditors against M. Nathan to have him declared a bankrupt. On the other hand, it is contended by the petitioning creditors that there was no sale of the property; that the pretended sale was simulated and carried out as a mere pretense of avoiding and preventing the petitioning creditors from securing the property under the bankruptcy proceeding. There is much in the testimony that tends strongly to sustain this view. The sale was mostly made on credit, to be paid for when the purchaser sold the property. Of the amount of cash received from the sale, to wit, $403, the sum of $200 was paid by Cohn to his sister, Mrs. Nathan. He testified that he gave her the money because she was in immediate need of funds on account of her husband's serious illness. He also paid his attorney the sum of $120, and to the physician in attendance upon his brother-in-law, Nathan, the sum of $40. He sold to Hausman, who is not engaged in merchandising, a bill of goods for $875, receiving therefor, in cash, the sum of $10, the balance to be paid when the purchaser sold the property. This property was stored in a cellar of one Manheim, and the purchaser soon after the sale departed on a visit to the East. The purchasers to whom Cohn delivered the property have not been made parties to this proceeding, and no order has been asked for against them. Under the circumstances above stated, taken in connection with all the facts produced at this hearing, it is not by any means clear that Cohn has made such a disposition of all the property that it can be said he has no longer any control over it. In the light of all the facts, I am of opinion that the injunction against Cohn should be issued as prayed for by the petitioners. It is so ordered.